1              UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                   (Asheville Division)

3

4  ---------------------------x
   UNITED STATES OF AMERICA,  :
5             Plaintiff,      :
                              :
6  vs                         :
                              :
7                             :Criminal Action:1-18-CR-86
                              :
8  FRANCISCO ESCAMILLA VILLA, :
              Petitioners.    :
9  ---------------------------x

10

                           **VOLUME II OF II**
11

                          Wednesday, December 4, 2018
12                        Asheville, North Carolina

13

         The above-entitled action came on for a Motion to
14 Suppress Evidentiary Hearing before the HONORABLE W.
   CARLETON METCALF, United States Magistrate Judge, in
15 Courtroom 2, commencing at 1:02 p.m.

16

           **APPEARANCES**:
17         On behalf of the Plaintiff:
           **DAVID A. THORNELOE, Esquire**
18         Office of the U.S. Attorney - WDNC
           233 U.S. Courthouse Building
19         100 Otis Street
           Asheville, North Carolina  28801
20
           On behalf of the Defendant:
21         **MARYELLEN COLEMAN, Esquire**
           Federal Defenders of Western NC
22         1 Page Avenue, Suite 210
           Asheville, North Carolina  28801
23

24
   Tracy Rae Dunlap, RMR, CRR          828.771.7217
25 Official Court Reporter

**I N D E X**

                    <u>**DIRECT**</u>   <u>**CROSS**</u>
James Allard........4........7

                                            <u>Page</u>
Reporter's Certificate.......................51

1                    **P R O C E E D I N G S**

2          THE COURT:  Madam Court Reporter, I see the time.

3    Do you need to leave?

4          COURT REPORTER:  Are you close to finish?  If

5    you're close to finish I'll stay.  But if you're not --

6          THE COURT:  Let me say -- and I'm going to make

7    this real clear.  We're going to finish the hearing until

8    it's finished.  We're not going to cut it short.  We're

9    going to make sure everybody has the time to do what they

10   need to do.  So I don't know how long this is going to

11   take.  There needs to be argument, of course, and I don't

12   know if the defendant is going to put on evidence.

13          Let me inquire of that now that the government has

14   concluded its evidence.  Ms. Coleman.

15          MS.  COLEMAN:  I think I have one brief witness,

16   Your Honor, very brief.

17          THE COURT:  All right.  Madam Court Reporter.

18          COURT REPORTER:  I have to go, yeah.

19          THE COURT:  Okay.  All right.  Then let me do

20   this.  For the record, we will proceed with the hearing

21   and with the evidence of the defendant.  The court

22   reporter has indicated she must leave and, so, I will

23   allow that.  But unless there's no -- unless there's an

24   objection from either party we'll proceed along and

25   continue to record using the court's audio recording

## DIRECT - ALLARD

1  capabilities.

2      Is that all right with you, Mr. Thorneloe?

3      MR. THORNELOE:  It is, Your Honor.

4      THE COURT:  And Ms. Coleman?

5      MS. COLEMAN:  That's fine, Your Honor.

6      THE COURT:  All right.

7      UNIDENTIFIED SPEAKER:  (Inaudible.)

8      THE COURT:  As long as someone is interpreting

9  fully and faithfully and accurately it's fine with me.

10     Okay, Ms. Coleman.

11     MS. COLEMAN:  Your Honor, I'm going to call Jim

12  Allard and Mr. Mark (Inaudible).

13     THE COURT:  All right.  Mr. Allard, please come

14  around and be sworn.

15          (Witness duly sworn at 1:04 p.m.)

16     THE COURT:  All right.  Ms. Coleman, proceed.

17               **DIRECT EXAMINATION**

18     BY MS. COLEMAN:

19  Q.    Could you please state your name for the record?

20  And spell your last name.

21  A.    James Allard, A L L A R D.

22  Q.    And, Mr. Allard, how are you currently employed?

23  A.    I'm} an investigator with the Federal Public

24  Defenders' office in the Western District of North

25  Carolina.

## DIRECT - ALLARD

1  Q.    How long have you been employed in that position?

2  A.    12 years.

3  Q.    Mr. Allard, I'm just going to ask you a couple of

4  questions.  Yesterday you were asked to investigate a

5  certain area along Highway 19; is that correct?

6  A.    Yes, that's correct.

7  Q.    And what, specifically, were you asked to do?

8  A.    I was asked to look at where the traffic stop in

9  Mr. Villa's case took place, and the route from his

10 residence to where he was pulled over in Topton.

11 Q.    And that would be the route from -- I think the

12 address was 948 U.S. 19?

13 A.    That's correct.

14 Q.    Is that correct?

15 A.    Yes.

16 Q.    And then the address where he was pulled over,

17 that was 281 Topton?

18 A.    Topton Road in Topton, yes.

19 Q.    Okay.  And, Mr. Allard, in the course of your

20 investigation, were you able to discern what county each

21 of these addresses was actually in?

22 A.    Yes, I was.

23 Q.    What county is Mr. Villa's address, the -- sorry

24 -- the 948 Highway 19 in?

25

### CROSS - ALLARD

1  A.      That's in Macon County.

2  Q.      Okay.  And then what county was the address of

3  Topton Road.

4          THE COURT:  Hang on one second.  Go ahead, Madam

5  Court Reporter.  We'll let you finish that.

6          Pardon me, Ms. Coleman.  I just want to make sure

7  our recording is very clear here.

8          Okay.  Why don't you restate your question again,

9  Ms. Coleman?  Thank you.

10         BY MS.  COLEMAN.

11 Q.      What county is the 281 Topton Road address in?

12 A.      That's in Cherokee County.

13 Q.      And how were you able to discern that?

14 A.      By a couple of ways.  Graham County, Cherokee

15 County, and Macon County all converge where this bridge

16 crosses over from Highway 19.

17 Q.      How do you know that?

18 A.      Because I was there physically, and the signs were

19 there.  I took pictures of the signs.  And then the owner

20 of the address of 281 Topton Road, a Jessica Frost, was

21 at home, and I talked to her.  I said, "Were you aware of

22 the traffic stop in your driveway?"  And she was.  And I

23 said, "What county do you live in?"  And she said, "This

24 is Cherokee County."

25 Q.      Okay.  Did you approximate or estimate the

**CROSS - ALLARD**

1  distance between these two addresses?

2  A.    Yes.  It was almost 1.1 miles.

3  Q.    Okay.  That's all I have, Your Honor.  Thank you.

4       THE COURT:  Mr.  Thorneloe.

5       MR.  THORNELOE:  Just briefly.

6                    **CROSS-EXAMINATION**

7       BY MR. THORNELOE:

8  Q.    Good afternoon, Mr. Allard.

9  A.    Good afternoon.

10  Q.    So you didn't go to a survey office or anything

11  like that to verify these facts that you just testified

12  to, did you?

13  A.    No.  In addition to talking to Ms. Frost, having

14  run an ACRO report on her address and it did come back as

15  Cherokee County, North Carolina.

16  Q.    Okay.  But you didn't make reference to maps or

17  surveys or GIS information or anything like that, did

18  you?

19  A.    Just the byproduct of those:  The signs that were

20  posted.

21  Q.    I got you.  Okay.  Thank you, Mr. Allard.

22       THE COURT:  Any redirect?

23       MS.  COLEMAN:  No, Your Honor.

24       THE COURT:  All right.  You may step down, sir.

25            (Witness excused at 1:08 p.m.)

1     THE COURT:  Ms. Coleman, any further evidence by

2  the defendant?

3     MS.  COLEMAN:  No, Your Honor.

4     THE COURT:  All right.  Mr.  Thorneloe, any

5  rebuttal evidence by the government?

6     MR.  THORNELOE:  No.  No rebuttal evidence, Your

7  Honor.

8     THE COURT:  All right.  I will hear argument.

9  I'll give the government the chance to open and close the

10  argument.

11     MR.  THORNELOE:  Thank you, Your Honor.  Your

12  Honor, I think the facts that have come out here today

13  are very much like what we expected them to be, so I just

14  want to highlight for you some way of looking at the

15  facts and the portions that matter.  Essentially, we have

16  two issues for the Court to decide.  One is whether or

17  not the defendant was in a custodial interrogation

18  with respect to his very statements, and whether or not

19  the consent to search that he gave of his home was

20  voluntary consent.

21     Let's just walk a little bit through the facts and

22  examine some of the statements.  So, initially, the

23  defendant was stopped by the side of the road pursuant to

24  the traffic violation.  There's every reason to think

25  that that traffic violation is valid; it was testified to

without contrary evidence. Even if it is a pretextual
stop there is nothing wrong with a pretextual stop. Case
law says that's fine.

Then, from there, we saw that the stop itself
probably lasted something less than 30 minutes.
Initially, the officers approached the vehicle and --
immediately before they even spoke with the defendant --
they noticed the odor of marijuana. And the defendant
made statements about marijuana, as well. The testimony
of the officers was also that the defendant essentially
gave consent to search his person for marijuana which
resulted in a vape pen, as you heard about, and cash.

What I'll tell you is ultimately not terribly
significant, what was found on the defendant's person,
but, from there, the traffic stop continued. And the
purpose of the traffic stop was lengthened because there
was a need to search the vehicle for marijuana. 1. The
officers may have interpreted the defendant's remarks to
mean he gave consent; and 2. The odor of marijuana
provides probable cause to search the vehicle for
marijuana and, so, that search is valid.

Then you see that Detective Stewart -- Task Force
Officer Stewart, he arrives on the scene and begins to
have a conversation with the defendant. The entirety of
his conversation occurs during the search of the vehicle.

1        THE COURT:  Let me ask you a question about this.

2   Would you agree that there's a factual dispute as to

3   whether consent was given for the weapons' risk and the

4   personal search?

5        MR.    THORNELOE:  I think that there are no

6   evidence -- there's no evidence on the other side of

7   that.  We have that one witness who testified -- let me

8   come back to that.  My officer, Detective Breedlove,

9   testified that he got consent for that.  There's an

10  affidavit that is on the other side of that which I

11  wasn't thinking of, but -- so that forms a factual

12  dispute.  So we have one individual that gave live

13  testimony, was cross-examined; we have an affidavit on

14  the other side of that.  So there is a dispute as to that

15  consent between those two documents and that witness.

16        And then, Your Honor, from there we have that

17  Detective Stewart had a conversation with the defendant,

18  and some statements were made during that conversation

19  that are important.  The two that are the most important,

20  well, one relates to whether there's consent to search

21  back at the house, and the other is the defendant saying

22  that there are a couple of guns back at his house.  And

23  it's really important for the Court to note that that

24  consent to search the house was complete before the

25  search of the vehicle because the traffic stop was not in

large or lengthened to have a further conversation with the defendant.

All the conversation that matters with the defendant was completed when that search of the vehicle ended. So the only statements we are concerned with are the ones that happened at the traffic stop are the ones that happened during the search.

THE COURT: Am I correct that during a traffic stop parallel lines of investigation can be opened as long as it doesn't otherwise lengthen the traffic stop unreasonably?

MR. THORNELOE: That's the government's position. That if while the traffic stop is being reasonably resolved, whether or not be a traffic matter or something that naturally has arisen from the traffic stop from which there is justification to do a search, such as the search of a vehicle for marijuana, that that parallel investigation can be pursued which is essentially what we're saying happened and which developed into voluntary consent to search back at the house.

We would submit to the Court this is the type of consent that is really unusual because it wasn't brought up by the defendant. Now the defendant disputes that in his affidavit, but Detective Stewart's testimony is that while he asked a question about whether there were drugs

1  in the house he never asked, can I go to your house and

2  search?

3       THE COURT:  Let me back up before I forget a

4  couple of things I wanted to ask you.  There's been no

5  testimony about audio recordings; correct?

6       MR.  THORNELOE:  Correct, Your Honor.

7       THE COURT:  There's been no testimony about video

8  recordings so we don't have any of that type of evidence.

9       MR.  THORNELOE:  We don't have any of that type of

10 evidence.

11      THE COURT:  With respect to any factual disputes

12 that may exist.  Would you agree that those disputes are

13 for the Court to determine based on the credibility of

14 the witnesses and the weight of the evidence?

15      MR.  THORNELOE:  I agree, Your Honor.

16      THE COURT:  Okay.

17      THE COURT:  Because in this case, when we get to

18 the house, we're talking -- there is a consent form, and

19 it's Government's Exhibit 1, and it's been admitted

20 without objection.  There is no question that there is a

21 consent form that's signed.

22      MR.  THORNELOE:  There is no dispute as to that.

23      THE COURT:  Now the defendant is going to say --

24 has said and has argued in briefing that that -- that

25 there is a question as to the voluntariness of that

consent and whether that's a legitimate consent. But

there's at least no dispute that there is a form there.

That's not the case with respect to the alleged consent

for a weapons frisk and the personal search. You agree

with that.

MR. THORNELOE: I think that's right, Your Honor.

THE COURT: Okay. So the defendant was stopped

initially and -- as I heard the evidence, it appeared

that the justification -- the only justification was

based on the traffic violations. Is that -- would you

agree with that?

MR. THORNELOE: There may be some distinction

between pure traffic violation, such as speeding and

moving across the center line, and driving without a

license. I still think that -- they're all traffic

related, but those are the three reasons.

THE COURT: Fair enough. Fair enough. So

crossing the center line, exceeding the posted speed

limit, and driving without a license. If we cull that

the bucket traffic-related offenses, that was what

created the reasonable suspicion to support the stop in

the first place.

MR. THORNELOE: Yes, Your Honor.

THE COURT: Okay. There was no reasonable

suspicion with respect to drug issues or the prior

1  investigations or anything like that.

2      MR. THORNELOE: No, Your Honor, that's not our

3  basis.

4      THE COURT: Okay. All right. Go ahead.

5      MR. THORNELOE: So, Your Honor, it's important to

6  note that the consent to search and the voluntary -- the

7  statement concerning weapons at the home were attained

8  prior to the end of the search of the vehicle. From

9  there we have this volunteering of consent to search the

10 house which is unusual. And our version of the facts for

11 Detective Stewart is that the defendant volunteered that.

12 The defendant was asked, hey, do you really want us to

13 come search your house? And he agreed to do it and

14 accepted a ride to the house and, then, from there, they

15 traveled to the house a very short distance. Clearly,

16 it's about a mile. One mile or 1.1, whatever it was.

17 And the defendant rode in the back of one of the police

18 vehicles. There's no evidence that he even knew that

19 those doors were locked, just that that's where he rode,

20 and he was there for probably a little more than a

21 minute.

22     THE COURT: Let me ask you about this invitation

23 to search. So as I was listening to Detective Stewart's

24 testimony I was trying to listen very closely and take

25 notes. And what I thought I heard him say initially was

that when he was talking to the defendant, while the
search of the vehicle was taking place, that they had a
conversation and he said something to the effect of, are
there any weapons or anything -- any guns or drugs --
actually drugs, I guess, in the vehicle?  No, there's
not.  I don't have any in the vehicle.

Do you have anything in your vehicle either?  No,
I don't have anything there.  You-all can go check if you
want to.  That's the invitation, I think, that you're
talking about.  But a little bit later, when nothing else
was found in the car, I thought I heard him testify that
as the search was concluding he said something to the
defendant to the effect of, if you're okay with it we'll
go search your house.

First of all, tell me if I'm wrong with regard to
how I heard his testimony.  And then I'm going to ask you
as to whether that makes a difference.

MR.  THORNELOE:  Your Honor, I honestly can't
remember the specific wording of that followup comment,
the "if you're okay" comment.  I don't doubt what you
heard.  I just don't remember that -- the wording of that
comment, and I didn't make a note of it.  What I do
recall is the initial "you can go check," the invitation
volunteering to come see the house, and Detective Stewart
testifying that they confirmed with the defendant:  Do

you really want to do this?  Are you really offering
consent?

He had really two opportunities at the roadside to
change his mind about that and, then, from there they
indeed went to the house.  We know that prior to
searching the house and prior to doing -- asking any
further questions they went through that consent to
search form and that that was at 7: 29.  And I'll note
that 7 o'clock to 7:29 is a really short period of time
and is not an unreasonably lengthy period of time that
would cut towards custodial interrogation with regards to
the roadside stop, especially when } you have a reason to
extend the stop which was the odor of marijuana.  So we
have that time hack, if you will, of 7:29.

And then if we think of -- I think we should parse
the conversations somewhat that have happened in this
case.  We could think of the conversation that happened
back on the roadside as "Conversation 1."  And, then, I
think if you were to analyze the conversations it might
be appropriate to separately evaluate each one and decide
whether or not they amount to a custodial interrogation.
And it may be appropriate that the roadside conversations
have one set of analysis and that later conversations
have a different set of analysis.  With that said, there
were no questions asked prior to the form being signed at

1    the house.  And then, from there, you have a very

2    intermittent conversation with the defendant from,

3    basically, 7:30 till probably 8:30.

4         THE COURT:  Is that "Conversation 2," in your

5    analysis?

6         MR.  THORNELOE:  I'd call that "Conversation 2,"

7    Your Honor, yes.  During the search of the house you have

8    occasional questions about things in the house such as,

9    where is your bedroom?  How do I get to the safe?  That

10   kind of thing.  So during that period of time you could

11   -- I think the circumstances about whatever was asked and

12   answered during that period are pretty much the same.

13   Nothing really changes from a legal perspective, I don't

14   think, during that time.  You've got law enforcement who

15   are inside the house at that point.  And the defendant in

16   this case he is -- he's already been told he's not under

17   arrest.

18        And let me just mention that in this case the

19   phrase "you're not under arrest," I would submit to you,

20   is even more important than usual.  The case law says

21   that phrase is not talismanic, or however you say that,

22   but it is a factor in favor of the government.  It

23   doesn't say it's not.

24        THE COURT:  It's a factor; it's not dispositive

25   though.

1    MR. THORNELOE: It's not a dispositive factor,
2 that's right, Your Honor. But in this case I would
3 suggest to you it's more powerful than usual. Because at
4 the roadside the likely arrestable offenses are
5 marijuana. That's what we're searching the car for.
6 That's what everybody smells. We've asked about that,
7 and the words in evidence, and drug trafficking, and
8 those issues, haven't come up at all, and the defendant's
9 -- any comments about guns and that the defendant didn't
10 know that that was an offense, and it wasn't raised as an
11 offense.
12    The only offense that was on the table, really, at
13 that point, was marijuana possession. And the officer
14 dispelled the idea that he was going to arrest him
15 pertaining to that particular offense: "You're not under
16 arrest; I'm not going to arrest you for marijuana" is
17 what was said, which -- so, in this case, that's even
18 more powerful than "you're not under arrest." Because if
19 the defendant -- say the example is -- there's a lot of
20 child pornography cases in these instances, and the
21 defendant is sitting on a mountain of child pornography,
22 and he says you're not under arrest. It's kind of hard
23 to believe that all this child pornography before us may
24 not be a reason to arrest. It's at least a little harder
25 in this case, an offense like marijuana possession, which

is a misdemeanor minimal possession amount.  So it's even
more believable that you're not under arrest for that
reason.  So I would say that is particularly important in
this case.

        But moving back to the residence.  Your Honor,
what is the defendant's custody status at that point?
He's certainly not restrained, physically speaking.  He's
been in the back of the patrol car very briefly, which he
consented to.  He's not handcuffed.  His personal
property is reachable to him with -- I agree with the
exception of the vape pen and the cash that was taken
from him.  But his cell phone, his wallet, his keys, are
not locked away somewhere.  And he's with a detective,
Lieutenant Willis, but, really, nothing is going on
between the two of them.  He's not being restricted in
his movements particularly, at least, not in a way that's
expressed to him.

        So what the officers subjected internal beliefs
about what restrictions they placed on him really don't
matter that much.  It's what someone in his position
objectively feel about his custody status.  Then we have
calm tones.  The defendant is calm.  The agents are calm.
The numbers of officers there is seven.  That's how many
there are.  That's not really a disputed fact in this
case.

1          THE COURT:  And that's a lot for a traffic stop.

2          MR.   THORNELOE:  Well maybe it depends, Your

3     Honor, on the way they interact with the defendant.  How

4     many are actually talking to him, how are they acting,

5     and what sort of compulsion and coercion are they

6     applying upon him?

7          THE COURT:  So the number of agents, in your mind,

8     does not cut in favor of the defendant?

9          MR.   THORNELOE:  I would say it's probably a

10    neutral factor if you consider the entire 90 minutes at

11    the traffic stop.  That's probably more than we usually

12    see at a traffic stop.  At the residence, that's not more

13    than you would see at a search of the home.  That's

14    actually fewer than you see.  In a lot of the case law

15    you see 20 to 30 agents sometimes at -- and a search

16    warrant being conducted.  So perhaps at the traffic stop

17    that's a little more than usual.  But if you narrow it

18    down and say, how would they impact the defendant in this

19    case?  Well they were pretty cool cucumbers there.  They

20    were not coercing and compelling the defendant on the

21    scene there.  What you got was the way -- I would submit

22    the way detective Stewart acted which is he's very

23    conversational he's very calm he's very engaging in a --

24    just a ordinary everyday way lath rather than being

25    interrogation technique.

1      THE COURT:  Let me go back to this invitation

2  issue.  Lawyers in the civil bar really like to discuss

3  the difference between consenting to a motion and not

4  objecting to a motion.  Now that may not be a good

5  analogy for this case, I don't know, but is there a

6  distinction here between a defendant who invites law

7  enforcement to come to his home and search as opposed to

8  a defendant who consents to a request from law

9  enforcement to search?

10      MR.  THORNELOE:  I think there is, Your Honor.

11  And there may even be a third category of, sort of,

12  compliance with, you know, someone kicking your door in

13  and you don't fight the cops.  That doesn't mean you

14  consented to it.  Clearly, we're not there.  I would say

15  that, as I said previously, I think we have sort of

16  consent plus the fact that the defendant brought this up

17  demonstrates that it is a particularly cooperative

18  defendant, a defendant who's not nervous about this, and

19  feels like he has nothing to hide and is not coerced into

20  giving that consent whatsoever.

21      THE COURT:  Let me ask you hypothetically.  If the

22  Court were to find that the invitation -- that there were

23  not an invitation made -- an invitation was not made by

24  the defendant, what does that do to the government's

25  position?

1          MR.   THORNELOE:  Your Honor, I think you still
2    have consent.  I mean at least you have consent.  The
3    case law says that written consent is better proof of
4    consent than lack of written consent.  I've never had a
5    case with an invitation, and I didn't even find much case
6    law about that.  There's no reason to think that it's a
7    good factor for the defendant.
8          THE COURT:  But that's what is being urged by the
9    government here, isn't it?  That the defendant not just
10   consented to have law enforcement come to his house,
11   where he knew there were weapons, but that he invited
12   them to come there.  That's the position, if I understand
13   it.
14         MR.   THORNELOE:  Right.  And, why, you might be
15   wondering.  I offer, as a theory -- and here is my theory
16   of why he offered that.  He knew he didn't have any
17   drugs, and he didn't think that weapons were an offense,
18   and he could offer for the officers to come that day and
19   they would see everything is fine here and end the
20   investigation, and the heat was off.  I'm not saying that
21   that's been testified to or that's in his affidavit or
22   anything Detective Stewart heard that fits the facts
23   though.
24         So, Your Honor, I do say that there was an
25   invitation, and there is -- you can infer a reason that

1  there is an invitation because the defendant didn't think

2  he had anything he needed to hide; he just didn't know he

3  did.

4      THE COURT:  He knew he had firearms but he was not

5  concerned about that.  He knew he does not have any

6  narcotics so he has nothing to hide.  That's the theory

7  you're talking about?

8      MR.  THORNELOE:  That's right.

9      THE COURT:  Okay.

10      MR.  THORNELOE:  That's right.  And that fits our

11  facts.  So, Your Honor, if we're talking about --

12      THE COURT:  I expect we may be about to hear a

13  different theory from the defendant.

14      MR.  THORNELOE:  I am sure (inaudible).  But, Your

15  Honor, with respect to -- let's go back to talking about

16  the conversations at the house which is what I refer to

17  as "conversation 2."  So while the search is ongoing you

18  can look at that conversation that happened, which is

19  incriminating to the defendant.  He knows where the guns

20  are.  He knew they were in the safe.  He showed them the

21  safe where the guns were located.  He knows where the

22  guns are.  He can get into the safe where the guns are

23  located and things like that.  It shows he had some

24  control or ownership over the firearms, and he pretty

25  well acknowledges, hey, these are mine.

 1          Then, at the end of the search, you have a third
 2     conversation.  The defendant still hasn't been accused of
 3     anything in particular, and the tone of the conversation
 4     is the same as it has been all along.  Detective Stewart
 5     asks him some questions about, "What's up with the
 6     guns," is basically the way he phrased it.  Why all
 7     these guns?  He says, well, I'm a mechanic, you know, and
 8     I buy and trade them sometimes.  That suggests to me
 9     maybe he gets them as compensation for his mechanics
10     business.  But he also says, yeah, there's some folks
11     around here that concern me, and I have them for
12     protection.
13          So those statements at the very end are
14     incriminating as well.  You maybe could consider them as
15     "Conversation 3" if you want to break these out.  At that
16     point all the evidence is before him.  Still, the
17     defendant doesn't know in particular that possessing
18     those firearms is an offense.  And, really, even that
19     entire conversation is barely told to him that, hey,
20     because of your immigration status you're not supposed to
21     have these firearms.  Ultimately, the reason he's
22     arrested is marijuana and marijuana paraphernalia, and
23     he's taken away and not charged federally until later.
24          So, Your Honor, that's the, I think, big picture
25     of the conversations.  You have two issues to resolve.

You have custodial interrogation, and you have the
consent to search of the house, and that's the way I see
things.  I'll just save any further comments in response
to Ms. Coleman.

THE COURT:  Let me ask you one more question
before you sit down, if I may.  If, just hypothetically
speaking, the Court finds that there was no invitation,
and if the Court also finds that there was not voluntary
consent to search the residence, would there nonetheless
be probable cause for that search and, if so, why?

MR.  THORNELOE:  There's probably probable cause
to go search the residence for guns.  The problem is we
haven't -- I'm not standing here saying that that would
save the government's case, though, because we haven't
identified an exigent circumstance they would need to go
run in there with probable cause without a warrant.
That's his residence.  That's where his Fourth Amendment
protections are probably at their highest.  So, with that
piece of information, could the government have gotten a
search warrant?  Probably so.  Because the defendant said
he didn't have any legal status.  I own firearms and
they're in my house.  So I'm saying we could have gotten
a search warrant at that point.  That was probable cause.
That's not sufficient probable cause or circumstances to
go into his house absent consent without a warrant.

1          THE COURT:  I see.  Okay.  Thank you, sir.

2          MR.  THORNELOE:  Thank you.

3          THE COURT:  Ms. Coleman.

4          MS.  COLEMAN:  Your Honor, I'll start with what

5    the government just stated which is Fourth Amendment

6    protections are highest in your home, and that's why we

7    would have argued absolutely they could not have entered

8    Mr.  Villa's home without a warrant.  Even if they had

9    probable cause for the statements in regards to the guns,

10   get a warrant.  You can't immediately enter his home.

11          I'm going to take this a little bit out of order

12   just to address what's, sort of, first and foremost on

13   our mind which is the invitation.  And, of course, our

14   position is there was no invitation of Mr.  Villa to

15   enter his home.  There was no consent.  The legal phrase,

16   or the terminology we're looking for, is "begrudging

17   submission," and there's case law on it, and we cited it.

18   I believe it's *Roberts* and also *Bowman*.  *Bowman* is a case

19   out of this court where there was a very similar

20   statement made by a state trooper, as the judge was very

21   keen to pick up on.  It is very similar to the statement

22   which I wrote verbatim during the testimony today which

23   was:  "If you're okay, we're going down to your house and

24   take a look around."  That is not a question.  That is

25   not a, "Can we go to your house?"  That is not an

explanation of what we're going to do when we get there.
That is a, "We're going down to take a look at your
house.  Okay?"  And, if anything, at most what happened
next was a "begrudging submission" on the part of
Mr. Villa to then go along to the house.

THE COURT:  Isn't there some distinction in degree
between the statement in *Bowman* and this statement you're
talking about?  The statement in *Bowman* was made by a
trooper to the defendant, Mr. Bowman, who was seated in
the trooper's patrol vehicle.  And I think his statement
was to the effect of, "Hang tight.  I'm going to go talk
to the passenger in your car, Mr. Alvarez."  Am I
remembering the case correctly?

MS. COLEMAN:  That is correct, Your Honor.

THE COURT:  Isn't that -- that is the statement in
*Bowman*, more direct, severe, and in the nature of an
order more so than the statement that we heard today.

MS. COLEMAN:  I don't think in the totality of
the circumstances, no.  Because what you have here -- as
opposed to the *Bowman* case which is one trooper -- is you
have a theme that is a police dominated atmosphere.
There are so many police officers dominating this scene
that when a statement was made it means something to
Mr. Villa.  It means we're going to do this.  Okay?
And then he has no other option other than to comply.

And that's what, you know, voluntariness is all about.
Is there another option?  Did you voluntarily allow this
search?

So I think the other major theme is this is such a
police dominated atmosphere.  The government doesn't give
much weight to the number of police officers, but we
would argue it should be shown great weight.  This all
begins -- it's a pretextual stop.  We know that because
it was a prior investigation.  But this all begins on a
traffic stop for a very minor traffic infraction of
speeding, touching the center line, the most severe of
which is an allegation of driving without a license.

However, almost immediately upon the scene we get
seven police officers and four vehicles.  And the
testimony of Officer Breedlove is that every single one
of them was wearing some type of identification as an
officer, body armor, and wearing sidearms.  That is the
immediate situation to which Mr.  Villa exits the car.
And we do argue that the patdown of his person was not
consensual.  One thing that is missing from any of the
testimony that we've heard today was any testimony in
regard to firearms, or believing that Mr.  Villa may be
armed, or that he's dangerous.  It's actually the
opposite and that he's very collegial.

THE COURT:  Let me back you up and go through this

1   sequentially then.  You heard the government's position

2   that the defendant was stopped upon reasonable suspicion

3   on the basis of the traffic violations, the speeding, the

4   going across the center line and lack of what I'll call a

5   lack of a driver's license.  If we can call those the

6   traffic violations, that's the position of the government

7   as I've heard it.

8         Don't you agree that that alone creates a

9   reasonable suspicion for the stop in the first place?

10        MS.  COLEMAN:  I do.  I do also believe there is a

11  question on jurisdiction which wasn't fully answered as

12  to whether or not a local Macon County police officer can

13  pull Mr.  Villa over in Cherokee County for traffic

14  infractions that aren't felonies.  I do think that there

15  is an argument to be made there about did they have

16  jurisdiction to stop him to begin with?  If they do, then

17  it is reasonable suspicion to pull Mr.  Villa over and I

18  can concede that if those traffic infractions were in

19  fact observed to and committed.

20        THE COURT:  And he has not, I don't believe,

21  denied speeding, driving left of center, or driving

22  without a license.  Am I correct about that?

23        MS.  COLEMAN:  We -- I think that the Court can

24  consider the credibility of the speeding and whether or

25  not an officer can estimate in that short period of time,

1  but we have no evidence to the contrary.

2  THE COURT:  Right.  He's put an affidavit in the

3  file in this case, and he didn't explicitly deny that.  I

4  don't think did he.

5  MS.  COLEMAN:  He did not, Your Honor.

6  THE COURT:  Okay.  Now what do you say about the

7  government's position that a parallel investigation,

8  essentially, was developed during the course of the stop,

9  and that investigation was essentially begun before the

10  traffic stop concluded?

11  MS.  COLEMAN:  I do believe that a -- I think when

12  you're looking at -- I guess this goes to the question of

13  whether or not he was in custody for the purposes of the

14  statements he made.  It's the *Miranda* issue.  And I think

15  the argument that we make is that even though there is,

16  maybe, a parallel investigation going on, you still have

17  to consider the police dominated atmosphere.  There are

18  two cases that we cited in our reply, *Hashime* and

19  *Colonna*, which basically find that even though the

20  defendant was there, he's told he's not under arrest.

21  Once you look at the large number of officers,

22  sort of, the isolation of the defendant, the loss of

23  control of the vehicle, the personal possessions.  Even

24  though there is a parallel investigation it's our

25  argument he is in custody at that point.  He is at least

detained for the purposes of a custodial interrogation from the time that Officer Stewart begins asking him very specific questions that are unrelated to the traffic stop.

And that's another point that's I'd like to make in this parallel investigation. There are questions being asked that are not related to the traffic stop, not to the marijuana vape pen, not to the traffic violations. When you're asking, are there drugs at your residence? Are there guns at your residence? That is exceeding the scope of anything that's been uncovered during the investigation of a personal use marijuana vape pen.

So we do believe that officers should have mirandized Mr. Villa before they started asking these questions and that these questions exceeded the scope of the traffic stop to begin with.

THE COURT: Let me ask you about the weapons frisk. The defendant has argued that the weapons frisk was improper. There's been a position taken by the government, I believe, that it was consensual. I know there's a distinction or a dispute, rather, about that issue, but was there -- even if we assume that he did not consent to the frisk, wasn't there at least one or more bases for the frisk to take place properly?

MS. COLEMAN: The only bases I could perceive

```
 1   would be that certainly there is no basis to pat him down

 2   for weapons.  There is no testimony at all that he was

 3   dangerous.  The only, I think, perceived patdown would be

 4   related to the smell of marijuana coming from the

 5   vehicle.  I don't believe that we received specific

 6   testimony in regard to Mr.  Villa's consent.  Officer

 7   Breedlove couldn't even remember if he was the one who

 8   patted him down or not.  So I don't think that we can

 9   credit his testimony in regard to whether or not

10   Mr.  Villa consented.  He also could not explain what

11   specifically was asked of Mr.  Villa and if it was

12   explained to Mr.  Villa what a "patdown" was.  Even given

13   that, officers -- even, could they pat him down for

14   potential marijuana?

15        I do think there is a problem with the money.

16   Money doesn't feel like drugs, money doesn't feel like a

17   gun, and that's what *Terry* is.  Is there a weapon readily

18   apparent?  And this is part of the issue with Mr.  Villa

19   being custodially detained is that they take the money.

20   The money's not connected to a personal use misdemeanor

21   vape pen or a traffic stop.  And the money is never given

22   back to Mr.  Villa.  So this all goes to the totality of

23   the circumstances where he's told he's free to leave but

24   he doesn't have his personal possessions.

25        THE COURT:  But the detection of the odor of
```

1 marijuana.  Does that not give rise to probable cause to

2 search both the car and the person of the defendant?  Not

3 just a reasonable suspicion but probable cause to search.

4 Or am I wrong about that?

5     MS.  COLEMAN:  It does the vehicle.  They did not

6 -- I don't think that they specifically stated whether or

7 not they smelled, in the testimony today, marijuana on

8 Mr.  Villa's person or in the vehicle.  I think the smell

9 of marijuana gave them probable cause to search the

10 vehicle, but there was no contraband found in the

11 vehicle.

12     THE COURT:  I think the testimony was they smelled

13 both emanating from the vehicle and, perhaps, from the

14 defendant as well.  We can check the record to confirm

15 that.  But, if that were in fact the case, would you

16 agree that that would also, then, give them probable

17 cause to search his person?

18     MS.  COLEMAN:  For marijuana, Your Honor, yes.

19     THE COURT:  Okay.  All right.  Go ahead.

20     MS.  COLEMAN:  Once we get -- so our argument is

21 that Mr.  Villa was detained.  Any statements that he

22 made at the side of the traffic stop were made in

23 violation of his *Miranda* rights.  It's those statements

24 that led to the purported invitation to come back to his

25 house, and then moving from the scene of the initial stop

1    and back to his house.

2        First, we'll note that it does not appear anyone

3    ever told Mr. Villa specifically that he was free to

4    leave. And the purposes of the traffic stop were

5    concluded but not in a normal manner. Like, there were

6    no citations given to Mr. Villa. Mr. Villa wasn't

7    told, okay, you're free to go. Instead, what happens

8    next is the begrudging, well, let's take you back to your

9    home. And there's testimony that, oh. Well he was free

10   to go; he could have gone any time.

11       But what we're looking at is, what would a

12   reasonable person think when his possessions are still

13   being held by the police? They have his $3,000 in their

14   car, they have locked up his car at that scene and told

15   him he can't drive. And it's under those circumstances

16   that they're also saying, oh. Sure, we'll give you a

17   ride. And I think there's a question in regard to, is it

18   a ride home or is it a ride to search your house?

19       And I do also think that there's weight given to

20   this argument that it's a police dominated atmosphere.

21   And if there's four cars on the scene, and the car that

22   Mr. Villa is placed in is the one that's the actual

23   police car whose doors can't open from the inside, and

24   that's the vehicle he's transported in. So if you're

25   looking from the perspective of, what would a reasonable

1  person think?  A reasonable person would think I'm in

2  custody.  I'm in the back of a police car and I don't

3  have the right to tell them I want to go.  I want to go.

4  No one is going to do that with four cars and seven

5  officers.

6      And then that sort of atmosphere continues.  Once

7  you get back to the house he's let out of the car but

8  he's never told, hey.  You're free to leave.  He's

9  brought a consent form.  It's not read to him in English

10  or Spanish, and it's not clear from the record that he

11  can read.  It's not interpreted to him.  You have seven

12  officers standing around.  Are you going to consent to

13  search?  All of your property is on the hood of the car

14  and it's not given back to you.  You're just supposed to

15  understand somehow that you're allowed to get your stuff

16  and go from this scene where they're invading your house?

17      THE COURT:  What do you make of the testimony that

18  he's been in the country for 17 years, and the community

19  in which he lives is not one where there are many folks

20  of Hispanic origin or Spanish speaking individuals, so

21  that he must be able to speak English in order to get

22  around?  What do you make of that position?

23      MS.  COLEMAN:  I would argue that neither officer

24  testified that they are an expert in linguistics or in

25  census population of that area.  I just don't think that

1   we can give it much credit.  I think that, you know, I

2   could just as easily argue, you know, people get by

3   without speaking perfect English.  People get by --

4   immigrants get by in our community and don't understand

5   everything that's communicating.  But in something as

6   important as waiving your right to have your house

7   searched?  I believe it's incumbent on the officers to

8   make sure that they know -- or make sure that this

9   defendant understands because, otherwise, the consent is

10  not voluntary.  And that did not happen in this case.

11          And then as -- so all our argument is, again, he

12  is clearly detained.  They can argue that, oh.  He could

13  pick up his stuff and he could leave.  He's got a car

14  there.  He'd already been told he can't drive.  His cell

15  phone, his wallet, everything is all in that car.  He

16  would have to go up -- he's been escorted by Officer

17  Lewis.  He would have to leave that officer and get all

18  his possessions.

19          And then something even more troubling, in regard

20  to whether or not he's detained, is that he -- the

21  officers testified that he's free to use his cell phone,

22  but he is not.  The one time he tries to use the cell

23  phone to talk to the person who's closest to him in his

24  native language, he's not allowed to do that because the

25  police want to be able to listen in to his phone calls.

And I do think that it is not believable that he is free
to leave and not in custody when he's not allowed to call
his wife and speak his language to his wife without law
enforcement listening in to it.

THE COURT:  To what extent can the information
about his previous alleged criminal activities and the
government investigation of this defendant come into play
here.

MS.  COLEMAN:  I think that -- basically, I think
the Court can consider it in the motivations of the
police officers.  I mean, frankly, their motivation was
to get in that house, and they were going to do whatever
they could to get in that house.  But if you look at the
evidence that was developed in the course of this
investigation they had zero evidence that there was going
to be drugs found at the house.  At most, they had
evidence that there would be guns found in the house.
But our argument is that those statements should have
been suppressed and are a violation of Mr.  Villa's
*Miranda* because he was already detained at the time he
told them that.  And if they wanted to search his house
for firearms they should have gotten a warrant to get in
that house.

THE COURT:  Would the previous -- I'm backing you
up chronologically, I know, and I'm sorry.  Back to the

weapons frisk.  Would the previous information that they

had obtained from surveillance of the defendant and that

investigation have been properly considered when they

were thinking about a weapons frisk, for example, at the

stop?

MS. COLEMAN:  I don't think that any officer -- I

don't think there's any evidence in the record from the

testimony today that there was reliable information that

he was currently armed or currently dangerous.  And there

was no testimony -- I think I specifically asked this

from the officers and whether they saw Mr. Villa exit

the house with weapons.  No weapons were seen upon

approach to the vehicle.  So I don't think there's

anything in the record to support that he could have been

patted down because he was armed and dangerous.  I think

that we have, maybe in the pleadings, some second and

thirdhand talk about it.  But you can even look in the

pleadings and there's nothing current in regard to

whether or not Mr. Villa was currently armed.  I think

if they would have felt -- needed to have felt he was

dangerous in order to pat him down for firearms.

THE COURT:  All right.

MS. COLEMAN:  So, I think, in conclusion, Your

Honor, you know, our argument is that he didn't consent

to the search of his person and home.  Whether consent is

voluntarily given, written consent is just one factor.
There are five factors under *Roberson* that's cited in our
motion to suppress and, of those factors, many weigh in
Mr. Villa's favor. The officers -- number of officers
present, the characteristics of the person searched, and,
again, he's a non-native, a Spanish speaker. He is not
necessarily fluent in our criminal justice system as far
as consent to search. And we have no idea about his
level of education. At no point was he ever advised he
had the right to decline any of this, and I think that
that is fair for the Court to consider also.

So I think, based on the totality of these
circumstances and the law as presented in our pleadings,
what you'll find is that this -- again, I can't repeat it
enough. This atmosphere is so dominated by law
enforcement that there is no way that Mr. Villa could
have given such a voluntary consent to come to his home
and to search it.

THE COURT: Let me ask you a couple of questions
before you conclude here. As I indicated with
Mr. Thorneloe, I see no evidence of video or audio
recordings. Do you agree with that?

MS. COLEMAN: We specifically requested those and
-- I think I asked at the preliminary hearing if those
were available, and I don't believe that they were

1   equipped with cameras.

2       THE COURT:  And would you also agree that to the

3   extent there's a factual dispute, or factual disputes,

4   regarding the evidence in this case, that those would be

5   resolved by the Court based on the credibility of the

6   witnesses and the weight of the evidence?

7       MS.  COLEMAN:  That's correct, Your Honor.

8       THE COURT:  Now with respect to the evidence

9   specifically for the Court to consider on this motion.

10  The defendant -- excuse me.  The government has

11  introduced, without objection, what has been admitted

12  Government's Exhibit Number 1.  There are additional

13  documents that have been attached to the pleadings.

14  What's the position of the defendant with respect to what

15  the Court could consider with respect to the evidence?

16      MS.  COLEMAN:  I think that their pleadings are

17  part of the record and, so, the Court can consider them.

18      THE COURT:  What about exhibits to the pleadings?

19      MS.  COLEMAN:  I know that there is Trooper

20  Stewart's report -- sorry -- Task Force Officer Stewart,

21  Officer Breedlove's report, and the complaint, which is

22  also part of the record.  I don't know if the government

23  has a position.

24      THE COURT:  And perhaps -- if my memory is wrong

25  -- perhaps the defendant has included documents as well.

1   The Homeland Security report, for example?

2        MS. COLEMAN:  Those are the documents we attached

3   to our pleadings.

4        THE COURT:  Is there any objection to the Court

5   considering those as well?

6        MS. COLEMAN:  No, Your Honor.

7        THE COURT:  Okay.  So any documents in the record

8   that have been submitted so far in the position of the

9   defendant?  Or it's the position of the defendant that

10  the Court may consider the testimony today, Government's

11  Exhibit 1, as well as any documents that have been

12  submitted in the record today?  Is that right?

13       MS. COLEMAN:  Yes, Your Honor.

14       THE COURT:  Okay.  Thank you.  Anything further

15  from the defendant?

16       MS. COLEMAN:  No, Your Honor.

17       THE COURT:  Thank you.

18       Mr. Thorneloe.

19       MR. THORNELOE:  Thank you, Your Honor.  Just let

20  me put out there what our standard is before with

21  custodial interrogation.  It is that that action is

22  curtailed to a degree of formal arrest.  If you want to

23  see some cases where we have that, take a look at *Hashime*

24  and, let's see, what else?  *Colonna*.  There you have 15

25  to 30 officers, 23 FBI agents, a three-hour interview,

defendants pulled out of bed at night nearly naked and thrown out on their lawn. Their family is not allowed to smoke a cigarette. Now there is a police dominated environment. So that's what this defendant is comparing these officers to. The evidence doesn't really bare that out, that that's what these officers are like. Instead, let's rook at some of the factors that relate to custodial interrogation.

The duration of *Colonna* and *Hashime*, as I said, three-hour interviews. How long is our interview, really, here of the defendant on the roadside, "Conversation 1?" Maybe 15 minutes. We've got to go back and forth. The form is signed at the house by 7:29 p.m. So that conversation necessarily was pretty short. And how many questions were asked during that period of time? Investigative type questions. Not many. Three or four at that point.

The number of officers is maybe a little bit more than normal for a traffic stop, yes, that's true. But what effect did those officers really have on the defendant in this case? Not much at that traffic stop. The show of force; the display of weapons. Detective Stewart testified, who is the one who talked to the defendant, you -- you couldn't tell he was a cop. He was dressed in plainclothes. He had his fishing shirt on, or

absent plainclothes and no weapon showing.  No, you have
officers never showing a weapon.  No officer ever gave
any forceful commands.  There was nothing like that.

What about statements concerning custody?  None
were ever made.  The only statement concerning custody
was that you are not under arrest.  Restrictions on his
freedom of movement?  A little bit, particularly during
the search of the vehicle.  The officer said, hey.  Stand
back here with me.  It was a short period of time of
approximately ten minutes.

Officer tone and demeanor.  I doubt you will ever
get a case in here where the officers' tone and demeanor
are better than they are in this case.  These officers
are absolutely cool with this defendant.  He cannot
complain one bit about how they were acting or treating
him.

What about accusations of criminal conduct?
Nearly none.  We have an accusation of concerning traffic
offenses and use of marijuana.  The issue did not come up
at all.  They never mentioned drug trafficking.  The
defendant should not have felt, or reasonably felt, as if
he had been accused of a large drug conspiracy or large
drug trafficking.

Your Honor, with respect to the invitation.  It is
our position that there was an invitation.  This officer,

whose testimony came through very loud and clear, was
that the defendant brought that up for the first time.
Contrary to that, you have an affidavit that is
self-serving and has not been subject to cross-
examination.

The weight of the evidence is clearly in the
government's favor with respect to the invitation. And
our characterization of the evidence is that, followed by
the invitation, there was an opportunity given by the
defendant to change his mind. Not a "begrudging
submission" type statement that case law has, but another
chance to decide that he didn't really want to do that.
And then that was followed by the written consent form
which the case law says is a factor in the government's
favor.

And the defendant says, well, he doesn't really
understand English. There is nothing about that. You've
got the defendant, again, in his affidavit, and we have
two other officers who said he had no problems. He told
us he's been here for 17 years, he runs a business here,
he lives here. We talked to him and he never asked for
an interpreter. He never said he didn't understand what
was going on.

So, on the whole, you have to ask is was it
voluntary consent? And I say it was. You've got a lot

1  of strong factors in favor.  You don't have seven

2  officers hovering over him about consent.  You really

3  have one officer that talked to him about that.

4     Your Honor, finally, I'll leave you with this.

5  These issues don't necessarily get decided together.

6  They all go to the totality of the circumstances of the

7  issue.  Whether there was voluntary consent given on that

8  search form, you need to analyze that separately would be

9  our position.  And there could be a situation where an

10  individual was found to be in custodial interrogation and

11  consent was still voluntary.  Those are not necessarily

12  the exact same questions.

13     THE COURT:  Even though he was not mirandized.

14     MR.  THORNELOE:  Right.  *Miranda* is a different

15  area of the law, and the "fruit of the poisonous tree"

16  issue with respect to searches and custodial

17  interrogations are a little bit different areas of case

18  law.  I think you will find some case law that says they

19  don't necessarily have to be decided together.  That

20  said, Your Honor, our position is you should analyze this

21  position separately.  There's a factual dispute as to the

22  voluntariness of the consent, perhaps, but I don't think

23  the search of his person at the scene, at the traffic

24  scene, is particularly important.

25     Let's say you say anything you found at that

search is thrown out. Okay. So what? You don't have a
marijuana vape pen and $3,000. That's not what he's
charged with possessing illegally. I say it was still
okay. Your Honor, we do have the North Carolina case law
that says when there is probable cause of the odor of
marijuana you can search a person. And who did that
search? A North Carolina officer who was following his
own case law. So I think that that is okay.

Your Honor, I think, on the whole, we have
officers who behaved themselves exceedingly well and that
their communities should be proud of, who are working
hard to interact with the public in a way that finds
criminal conduct, that isn't an onerous police conduct.
If you want to see examples of onerous police conduct
look to the cases that they say this is like. This isn't
like those cases. So we ask Your Honor that you not
suppress this evidence.

THE COURT: Let me ask you this question about the
jurisdictional issue that the defendant has raised. Do
you want to make any argument about that?

MR. THORNELOE: Your Honor, of course. That
issue wasn't raised until today as far as I'm aware. I
don't think it's in a pleading from the defendant. If it
is, I apologize. We didn't come here prepared to point
to dots on a map or something like that. As far as I

1 know, that doesn't provide the defendant with any

2 particular constitutional right that would overturn any

3 of this evidence.

4     At most, you have county detectives who are -- if

5 you believe everything the defendant says -- just over

6 the side of the county where the traffic offenses

7 occurred and in the other county driving without a

8 license, and he was followed into the other county if you

9 find that he was in the other county there. I don't see

10 any case law, or any line of authority, that says that

11 even if they're right that that somehow compels the

12 suppression of the settings. That would be our position,

13 Your Honor.

14     THE COURT: All right. Let me do this. Are there

15 any issues -- well before I leave that topic, let me ask

16 you one other thing. With respect to the exhibits in the

17 record. Does the government have any objection to the

18 Court considering those?

19     MR. THORNELOE: No, Your Honor. I hadn't really

20 given it much thought. I think it's a little unusual to

21 have an affidavit, but maybe it's only unusual to me I

22 don't know. But I think what I would say about the

23 affidavit is what I've already said, which is that it's

24 entitled to less weight because the defendant did not

25 take the stand and he was not subject to cross-

examination.

THE COURT:  I'm thinking about the other materials
as well that have been included.

MR.  THORNELOE:  Yes, Your Honor.  Well, you know,
a lot of those are our reports of investigation, Your
Honor, so I'm not going to stand here and say you
shouldn't consider those.  There are things in discovery,
and things that are written about this case, that if the
defendant is comfortable with that then we're comfortable
with that too.

THE COURT:  Okay.  All right.  Are there any
issues that either party thinks would benefit from
supplemental briefing here?  I'm thinking about the
jurisdictional issue, frankly, but there may be others.
Now, having heard the testimony here, what do you say
about that, Mr.  Thorneloe?

MR.  THORNELOE:  Your Honor, I think with respect
to consent to search, and custodial interrogation, the
pleadings gave you the tests.  You've heard the major
case law.  We could always spend a little bit more time
finding one more case.  I don't know that that really is
a reason to do an initial briefing.

With respect to the jurisdictional issue.  I don't
know what particular argument she's putting forth with
respect to being in the other county.  As far as I know,

1  the defendant hasn't come out and said therefore suppress

2  all the evidence because we found you were in Jackson

3  County -- or Cherokee.  I'm sorry.  So if the Court were

4  to go in any direction whatsoever with that issue I think

5  there would need to be additional briefing.

6          THE COURT:  Ms. Coleman, what's your position on

7  that?

8          MS.  COLEMAN:  I agree.  The jurisdictional issue

9  didn't come in until we actually drove it and we realized

10 the actual stop, we believe, was in Cherokee County.  So

11 I haven't had a chance -- had the opportunity to do a

12 deep dive into the issue.  But I do think it would matter

13 in regard to whether officers had no right to stop him to

14 begin with, and everything they found from that point

15 forward would arguably be invalid.

16         As to the other issues.  I think that they are

17 pretty well briefed in our motion to suppress and our

18 reply.  I think all the case law is there.  As

19 Mr.  Thorneloe says, we can probably find one more case.

20 I think that they all applied to the evidence as it is,

21 but I'm happy, if the Court would like, to take an issue

22 and look at the jurisdictional issue.

23         THE COURT:  Why don't we do this?  Let me give you

24 -- is a week enough time?  I'm thinking about a short

25 supplemental brief of five pages.

1          MS.   COLEMAN:  that should be fine, Your Honor.

2          THE COURT:  So why don't we set a deadline of one

3      week for the defendant to file a supplemental brief on

4      that issue?  That's that t new issue that's been raised

5      today regarding the jurisdiction of the officers making

6      the stop.

7          Mr.   Thorneloe, would you-all like a week to

8      respond to that?

9          MR.   THORNELOE:  I think that would be fine, Your

10     Honor.

11         THE COURT:  Okay.  And then the government will

12     have one week to respond.  I'm not inclined to take any

13     replies, if that's okay.

14         MS.   COLEMAN:  That's fine, Your Honor.

15         THE COURT:  You-all can just do it.  Do it well

16     the first time, and I'm sure you will.

17         All right.  Are there any other issues we need to

18     take up for today?

19         MR.   THORNELOE:  Not from the government, Your

20     Honor.

21         THE COURT:  How about from the defendant?

22         MS.   COLEMAN:  No, Your Honor, thank you.

23         THE COURT:  Well let me just say thank you to

24     Mr.   Thorneloe and Ms. Coleman for your fine advocacy

25     today and briefs as well.  I have reviewed the documents

1    closely, and I will continue to review them closely.  I

2    look forward to seeing the additional materials.  And we

3    will -- I'll take the matter under advisement, and I'll

4    issue a memorandum and recommendation in due course.

5    Thank you-all very much.

6         MR.  THORNELOE:  Thank you, Your Honor.

7         MS.  COLEMAN:  Thank you.

8         THE COURT:  That will conclude all matters in this

9    case for today.

10        Thank you.

11                       (Off the record at 2:05 p.m.)

12                       **CERTIFICATE**

13        I, Tracy Rae Dunlap, RMR, CRR, an Official Court
     Reporter for the United States District Court for the
14   Western District of North Carolina, do hereby certify
     that I transcribed, by machine shorthand, from the
15   court's audio recording system, the proceedings had in
     the case of UNITED STATES OF AMERICA versus FRANCISCO
16   ESCAMILLA VILLA, Criminal Action Number 1:18-CR-86, on
     December 4, 2018.

17
          In witness whereof, I have hereto subscribed my
18   name, this 14th day of December, 2018.

19
                    __/S/__Tracy Rae Dunlap__
20                  TRACY RAE DUNLAP, RMR, CRR
                    OFFICIAL COURT REPORTER
21

22

23

24

25