**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:18 CR 86**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **FRANCISCO ESCAMILLA VILLA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's Motion to Suppress (Doc. 16), which has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B). The issues have been fully briefed, and the matter is ripe for ruling. Having carefully reviewed the evidence, the arguments, and applicable authority, the undersigned recommends that Defendant's Motion be granted in part and denied in part.

## I. Procedural Background

On June 8, 2018, a Criminal Complaint was filed charging Defendant with violating 18 U.S.C. § 922(g)(5) and 8 U.S.C. § 1325(a). See (Doc. 1). The same day, Defendant was arrested and made an initial appearance, during which counsel was appointed.

On June 13, 2018, preliminary and detention hearings were conducted. Probable cause was found, and Defendant waived his right to a detention hearing.

On June 20, 2018, the grand jury handed down a one-count Bill of Indictment charging Defendant with a violation of 18 U.S.C. § 922(g)(5). See (Doc. 9). Defendant pled not guilty during an arraignment on June 25, 2018.

On August 16, 2018, Defendant filed the instant Motion to Suppress (Doc. 16) and a supporting brief (Doc. 17). The Government filed a response (Doc. 24), to which Defendant replied (Doc. 25).

On December 4, 2018, the undersigned conducted an evidentiary hearing on the Motion.[1] Assistant United States Attorney David Thorneloe appeared for the Government. Assistant Federal Defender Mary Ellen Coleman appeared with Defendant. Interpreters were provided for Defendant during the hearing.

Post-hearing submissions included a Supplemental Memorandum (Doc. 29) and a Motion to Seal (Doc. 30)[2] by Defendant, and a supplemental brief (Doc. 35) in response by the Government.

## II. Factual Background

### A. Summary of the Government's Evidence

Two witnesses testified for the Government: Detective Matthew Breedlove, a narcotics detective with the Macon County Sheriff's Office, and Detective Josh Stewart, a narcotics investigator with the Macon County Sheriff's Office who is also a task force officer with the Department of Homeland Security.

---

[1] The transcript from the hearing is comprised of two volumes (Doc. 34, 32). Citations to the transcript refer to the volume and page number.

[2] In the Motion, Defendant requested that an attachment to his Supplemental Memorandum be sealed. That Motion was denied, and Defendant later filed a redacted version of the attachment.

### 1. Surveillance of Defendant

In the spring or early summer of 2017[3], law enforcement began investigating Defendant for the suspected trafficking and distribution of methamphetamine. (1-102.) However, as of June 7, 2018 – roughly a year later - no search warrant had been requested for Defendant's residence. (1-21, 22, 102, 143, 56, 144.)

Lieutenant Don Willis of the Macon County Sheriff's Office put together an operation in which law enforcement planned to saturate the area around Defendant's residence, observe Defendant, and take action if an opportunity presented itself. (1-101.) The operation involved the following personnel from the Macon County Sheriff's Office: Lt. Willis, Detective Breedlove, Deputy Ricky Younce, Detective Stewart, Detective Blake Buchanan, Detective Amber Wright, and Detective Dani Burrows. (1-102). Detective Stewart attempted to include a Spanish-speaking Special Agent but that individual had a scheduling conflict on the day of the operation. (1 – 179.) None of the participating officers spoke Spanish. (1-73.)

The officers utilized four separate vehicles (1-151, 102):

1. Vehicle 1 – An unmarked tan Ford Expedition equipped with blue lights and communication antennas, carrying Detectives Buchanan and Breedlove. Its use as a law enforcement vehicle was "fairly obvious." (1-25.) Detective Breedlove was wearing khaki pants, a polo shirt, and a ballistics vest with "sheriff" on the

---

[3] A Report of Investigation, submitted with Defendant's principal Memorandum, states that Detective Breedlove first received a tip regarding Defendant's alleged activities on March 15, 2017. (Doc. 17 – 1) at 2.

front and back, and was armed with his service weapon. (1-23.) Detective Buchanan was similarly attired and equipped. (1-70.)

2. Vehicle 2 – A marked Macon County Sheriff's Office Dodge Charger, carrying Deputy Younce (1-33, 183.). He was in uniform with a full-duty belt and badge, and was armed with a service weapon. (1-71.)

3. Vehicle 3 - A Black Tahoe with a special light bar, carrying Detectives Wright and Burrows. (1-72, 183.) They were wearing ballistics vests, were clearly identified as law enforcement, and carried sidearms. (1-72, 73.)

4. Vehicle 4 – A Silverado, carrying Lt. Willis and Detective Stewart. (1-107.) Detective Stewart was dressed in plain clothes, and had a lanyard badge. He was armed, but his weapon was concealed. (1-105.) He was not wearing his ballistics vest. (1-105.) He had longer hair and a beard. (1-106.) Lt. Willis would likely have been wearing a Polo shirt or a button-up shirt with an embroidered badge and an exposed handgun and badge on his belt. (1-105.)

On the evening in question, Detectives Buchanan and Breedlove, in Vehicle 1, positioned themselves in a public parking area on U.S. Highway 19 in the Topton, North Carolina community west of Defendant's residence and toward Cherokee County.[4] (1-22, 23, 54, 56, 57.)

Around 5:30 p.m., Detective Stewart and Lt. Willis, in Vehicle 4, took up a position

_____

[4] Cherokee County, Graham County, and Macon County all come together in this area. (1-61.) Defendant's residence is east of the Macon County/Cherokee County line. (1-106.)

4

on a hill across the street from Defendant's residence. Through the foliage, they could see Defendant's house and driveway. (1-103, 146.)

The officers communicated with each other via a car-to-car radio. (1-103.)

At 7:00 p.m., Defendant entered an automobile and drove west on Highway 19 toward Cherokee County and Detectives Buchanan and Breedlove. (1-24, 23, 105.) The weather was warm, sunny, and clear, and it was still daylight. (1-104, 146.)

Detective Stewart reported Defendant's movements to the other officers using the radio. (1-104.)

### 2. Traffic Stop

From his prior investigation of Defendant, and a check performed earlier that day, Detective Breedlove knew that Defendant did not have a driver's license. (1-24, 25, 60.) When Defendant's vehicle passed their location, Detectives Buchanan and Breedlove began following Defendant. (1-25, 26.) Within approximately ¼ of a mile, Detective Breedlove estimated that Defendant's vehicle was speeding. (1-26, 57-59.) In addition, the left-side tires of Defendant's vehicle crossed the center yellow line. (1-26.)

Detectives Buchanan and Breedlove began a traffic stop based on these violations, with Detective Buchanan activating Vehicle 1's blue lights and audible air horn while the vehicle was inside Macon County. (1-26, 63, 67.)

The other officers began traveling to the scene after hearing that a traffic stop was being conducted. (1 – 73 – 74, 107.)

Defendant did not pull over immediately but also did not attempt to evade the officers and turned into the driveway of a nearby residence. (1-26, 27, 62, 89, 94.)

After the two vehicles came to a stop, Detective Buchanan approached Defendant's vehicle on the driver's side while Detective Breedlove stood toward the rear of the car on the opposite side. (1-28, 63.)  Neither officer had a weapon drawn. (1-29.)

The driver's side window was down and Detective Buchanan smelled marijuana as he approached.  (1-28.)  He addressed Defendant, and Defendant readily produced "Mexican identification documents" or perhaps an international driver's license.  (1-29, 66.)

### 3.  Search of Defendant's Person

Defendant was asked to step outside and move toward the rear of his vehicle. Neither Detective physically touched Defendant immediately, and the situation was relaxed.  (1-29, 30, 31.)  Detective Breedlove testified regarding the following exchange:

> A:    Once we was in the rear of the vehicle, Detective Buchanan made him aware he could smell the odor of marijuana. And Mr. Villa made a voluntary statement that he had just hit the marijuana pipe, and that is the reason we could smell the marijuana and also give a consensual statement that we could check that he had nothing else remaining.
>
> Q:    So did you take that to mean that he was giving you consent to look for contraband?
>
> A:    That is correct.

(1 – 30.) (direct examination).

> Q:    And then just so to be specific about what was said, you said, "I smell marijuana." And it is your – – what did he say next?
>
> A:    I believe it was Detective Buchanan that informed him of the odor of marijuana. Mr. Villa stated to us he had

recently hit the marijuana pipe. And that was all he had and he didn't mind us checking.

Q:     He said he didn't mind you checking?

A:     That is correct.

Q:     Did you explain to him what a Terry pat down was?

A:     No, ma'am.

Q:     And so did you explain to him that you'd be putting your hands, searching his pockets, or anything like that?

A:     I did ask for him to place his hands on the car and explained to him that I was going to check his pockets at that time.

(1 – 66 – 67.) (cross-examination).

Detective Breedlove proceeded to search Defendant.  (1-108, 31, 64-65.)

The other officers began arriving at approximately this time.  First to arrive was Deputy Younce in Vehicle 2. (1-151.)  Lt. Willis and Detective Stewart in Vehicle 4 arrived next (1-108), followed by Detectives Wright and Burrows in Vehicle 3.  (1-150, 151.)  Blue lights may have been activated on one or two of the arriving vehicles for safety reasons. (1 – 33, 34.)

The search of Defendant took approximately one minute.  (1-32, 111.) He did not attempt to resist, was relaxed, and was not handcuffed.  (1-32.)   A bundle of U.S. currency, totaling in excess of $3000 (Doc. 17-1 at 3-4), and a marijuana vape pen[5] were taken from Defendant (1-37, 31, 68, 95) and placed on the hood of Vehicle 1.  (1-108, 153.)  Detective

---

[5] A vape pen is like a pipe and is commonly used to smoke or ingest a substance.  (1-31, 32.)

Stewart told Defendant he was going to get a bag for the currency so it would not get lost or blow away. (1-114.) Detective Stewart then took possession of the currency and the vape pen. (1 – 32.)

Other property belonging to Defendant was also obtained during the search and placed on the hood of Vehicle 1. (1 – 114.) This property included Defendant's wallet (1 – 164), two cell phones (1 – 164, 165), his identification, his keys, and his hat. (1 – 79).

### 4. Search of Defendant's Vehicle

Detectives Buchanan and Breedlove then searched Defendant's car. (1-110, 111, 112, 120, 35, 37, 75.) During this time, Defendant was not handcuffed or physically restrained and was free to move about, though he was required to stand in the general vicinity behind his vehicle. (1-36 – 37, 115.)

Detectives Wright and Burrows and Deputy Younce did not participate substantially in the search but were standing on either side of the vehicle. (1 – 75.)

Detective Stewart and Lt. Willis spoke with Defendant as the vehicle search was in process. (1-36.) Defendant admitted he had been smoking marijuana from a vape pen and asked Detective Stewart if he was in trouble for the marijuana they found. (1-115, 122.) Detective Stewart responded that Defendant was not under arrest for it. (1-122.)

Lt. Willis asked Defendant why he was carrying such a large sum of currency, and Defendant stated that it was for his rent. (1-116.) Defendant said he pays about $1100 in rent, and he identified the residence where he had stopped as belonging to his landlord. (1-116.) Defendant was asked why he had more than $1100, and he stated that he was behind on rent. (1-116.) Lt. Willis went to the residence and knocked on the door. (1-117.) A

male answered the door and said he knew Defendant but did not know anything about a

rent payment.  (1-117.)

Meanwhile, Detective Stewart continued talking with Defendant:

> So during that conversation, I asked him, Mr. Villa, you have
> a large amount of money.  You have some narcotics on your
> person.  Are you coming from your house?  He said yes.  He
> just left his house.  I asked him if there was anything else at the
> house that we should be worried about . . . or anything like that.

> At that point he adamantly denied that there were anymore
> narcotics in his house and he invited us to come look in his
> house.  He said, no, I absolutely don't have anything.  And you
> guys are more than welcome to come and look.

> Those aren't his exact words, but that is how I took what he
> was telling me.

(1 - 118.)

Detective Stewart further testified:

> Once he said that we can go down and search his house, for
> officer safety reasons, I did ask him if there were any firearms
> in the house. He did say that there were a few firearms. I told
> him it wasn't a big deal, that we could make sure those were
> secured and please don't access those or anything while we are
> there, just for officer safety reasons.

(1 – 120.) (direct examination).

> . . . .

> Q:    And you also during this conversation asked Mr. Villa
> because of the vape pen and the money, if he had drugs
> in his vehicle?

> A:    That is correct.

> Q:    You asked him if he had drugs in his residence?

9

A:    That is correct.

Q:    And he advised you that there were no drugs found in his car or his residence?

A:    Yes. He was adamant there were no drugs in this vehicle or in his house.

. . . .

Q:    Then you stated he invited you to look at his house?

A:    Yes. That is correct.

Q:    Did you ever ask him or tell him that he had the right to not consent to a search of his house?

A:    No. He was offering to take us down there to let us look.

(1 – 157 – 159.) (cross-examination).

The search of Defendant's vehicle took approximately 15 minutes, which was typical for a search of that nature. No additional contraband was found in the vehicle and Detective Stewart told Defendant he was not under arrest. (1-110, 111, 112, 120, 122, 35, 37, 75, 76.)

Detective Stewart testified as follows regarding his next exchange with Defendant:

Q:    Before you left the side of the road did you make sure that was really what he wanted to do?

A:    Yeah. As of the search was concluding, I asked him, I said, we are going to -- if you're okay with it, we will go down to your house and we'll take a look around. He said that was fine. At that point the rear door was open for him, we knocked in unrestrained and proceeded on down to his house.

(1-122-123.)

Detective Stewart reported to the other officers that he and Defendant had reached

10

an understanding to go back to Defendant's residence. (1-39, 40.) At this point, approximately 20 or 25 minutes had elapsed since the stop began. (1 – 40.)

Defendant advised the officers that he knew the homeowner where his automobile was located and felt comfortable leaving it at that location. The car was secured, though the keys were kept by one of the officers. (1 – 41.)

The rear door of Vehicle 2 was opened, Defendant entered the vehicle, and all vehicles proceeded to Defendant's house, which was about a mile away. (1-122 – 123.)

### 5. Search of Defendant's House

When they arrived at the house, Deputy Younce opened his rear door for Defendant who exited the vehicle. (1 – 123.) Detective Stewart exited his vehicle as well and placed Defendant's personal property, which he had carried from the stop, on the hood of Vehicle 4. (1 – 162.)[6]

A large white dog named "Kilo" came down the hill in an aggressive manner. (1-123, 124.) Defendant could tell the officers were worried about the dog so Defendant, escorted by Detective Stewart, secured the animal. (1 – 123 – 124.)

Detective Wright then went over a consent-to-search form with Defendant. (1-124, 88.) Detective Stewart was close enough to observe them but was not directly involved in the discussion. Other officers were standing some distance away. (1 – 83, 124 – 125.) Defendant reviewed the form and executed it, Detective Wright signed it at 7:29 PM, and

---

[6] Detective Breedlove recalled that Deputy Younce had possession of Defendant's personal belongings during the trip to the house. (1 – 79, 81, 85.)

Detective Stewart signed it as a witness. (Gov.'s Ex. 1). (1-125, 43, 44, 45, 83.)

Before the search began, in response to questions by Detective Stewart, Defendant stated there were no drugs in the house, that there were a couple of firearms in the house, and that there was a safe inside that contained $5000. (1 – 127 – 128.) Detective Stewart asked Defendant if he could open the safe but Defendant replied he did not have the key and that only his wife had access to the safe. (1 – 131 – 132.)

 The search of Defendant's house started around 7:30 p.m. and lasted approximately one hour. (1-45, 49, 87, 86, 91.) The front door was locked initially, so Detective Stewart came back to Defendant who provided a key. (1-128.)

During the search, Lt. Willis stood in the same general area as Defendant who was not handcuffed or restrained or told that he had to stay in any particular area. (1-46, 83, 84, 128 – 129, 142.)

Multiple bedrooms were noted so Detective Stewart walked back outside and asked Defendant which bedroom belonged to him and Defendant told him. (1 – 131.)

At some point later, a safe was located inside a TV entertainment center that was bolted down. Detective Stewart walked back outside and told Defendant that the safe was really the only thing the officers had not searched and asked if there was any way for Defendant to open it. Defendant responded that he could call his wife and have her come open it, but Detective Stewart refused this request because Defendant's wife did not speak English. (1 – 132 – 133.) Defendant then said he thought he might have a key on his key ring for the safe. He proceeded to use it, and to enter an access code, and opened the safe. (1 – 135.)

Officers seized firearms from the living room and Defendant's bedroom and additional marijuana pens (1 – 50, 131, 138.) Two pistols and $5000 in cash were seized from the safe. (1 – 135.)

Detective Burrows then noticed a shed outside. Detective Stewart asked Defendant what was in the shed and if it could be unlocked. Defendant provided a key, the shed was unlocked, and Detectives Burrows and Buchanan searched it, locating more firearms. (1 – 135 – 136.)

Lt. Willis and Detective Stewart walked back to the front of the residence and asked Defendant why he had the firearms. (1-138.) Defendant responded that he had them for protection. (1-138.) Detective Stewart told Defendant it was illegal for him to possess the firearms. (1-137-138, 139.)

Defendant was then handcuffed, arrested, transported to the Macon County Sheriff's Office and charged with violating state drug laws. (1-131, 139, 51, 87.) To that point, no one had read Defendant his Miranda rights. (1-74.)

Defendant said he spoke English "pretty well" and had been in the United States for approximately 16 years. (1-112-114.) Throughout the course of the encounter, Defendant's English appeared "sufficient," he was able to converse in English, never advised he did not understand something that was being said to him and did not ask for an interpreter. (1-113, 141, 167, 168.) (1-49, 50.) Detective Stewart also testified, however, that "once we concluded our initial investigation at the house," he eventually found a place on Highway 19 where he had phone service and "was able to make contact" in order "to let them know that an interpreter would probably be necessary to talk to [Defendant] further." (1-179).

13

**B. Summary of Defendant's Evidence**

    **1. Defendant's Affidavit**

Defendant did not testify at the evidentiary hearing but instead submitted an affidavit which stated, in summary, as follows:

Within about one minute of the traffic stop, several other police vehicles arrived at the scene. Two officers approached his vehicle, one asked for his license, and he provided his identification. Defendant was told to exit his vehicle, and one of the officers searched Defendant without his consent.

Approximately two to three of the six to seven armed officers on the scene began searching Defendant's car, while approximately three to four of the others began questioning Defendant about selling drugs from his home and the money found on him. During the questioning, Defendant was required to stand with his legs apart and his hands on the hood of a police car.

One officer told Defendant he did not believe that Defendant planned to use the money to pay his rent.

After searching Defendant's car, officers told Defendant that he was not under arrest for marijuana possession. However, Defendant was not told that he was free to leave and officers continued to question him about selling drugs for approximately 25 minutes.

During this questioning, the officers first brought up the idea of searching Defendant's home. They claimed to know a lot of drugs were located there, though Defendant denied it. The officers then told Defendant that if he would consent to a search of his home and no drugs were found, they would release Defendant. Defendant then told

the officers they could check his home because he felt he had no other choice and that the officers were going to search his home regardless of what he said.

The officers did not offer to allow Defendant to leave the location of the traffic stop on his own or to call someone to pick him up. Instead, Defendant was placed in the back of a police vehicle, the door was locked, and he was driven to his house.

Upon arrival, Defendant's movements were constantly monitored and restricted – he was directed to stand in front of the vehicle, was not allowed to enter his home, and officers were near him at all times. He was never told that he could leave.

Defendant was not allowed to call his wife or to answer four to five calls from her. Similarly, Defendant was not allowed to communicate with some of his neighbors who were in their yards and the neighbors were prevented from coming onto Defendant's property to talk with him.

Officers kept possession of Defendant's cell phone and personal property including his money.

While outside of his home, Defendant was questioned about guns and selling methamphetamine but was not given <u>Miranda</u> warnings.

After a few officers began searching the house, other officers asked Defendant to sign a consent form that was in English.

Defendant was instructed to provide the officers with access to locked areas in the home.

Overall, Defendant states that he believed he had to submit to the officers' commands, did not understand the search form, and felt scared during the encounter

15

due to his status as an undocumented Latino.

### 2. Investigator Allard

James Allard, an investigator with the Federal Public Defenders' Office, testified that Defendant's address is in Macon County while the location where Defendant was stopped is in Cherokee County. (2-5, 6.) The distance between Defendant's home and the traffic stop is approximately 1.1 miles. (2-7.)

## III. Legal Principles

### A. Burden of Proof

A defendant seeking to suppress evidence generally has the burden of proof. <u>See United States v. Dickerson</u>, 655 F.2d 559, 561 (4th Cir. 1981). However, "[o]nce the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence." <u>United States v. Gualtero</u>, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing <u>United States v. Matlock</u>, 415 U.S. 164, 177 n.14 (1974)).

At the hearing, the Government acknowledged that it bears the burden in response to Defendant's Motion. (1-19.)

### B. Findings of Fact

Findings of fact may be made by a district court when deciding a motion to suppress. <u>See</u> <u>United States v. Stevenson</u>, 396 F.3d 538, 541 (4th Cir. 2005). "When material facts that affect the resolution of a motion to suppress . . . are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." <u>United States v. Taylor</u>, 13 F.3d 786, 789 (4th Cir.1994).

16

In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." Gualtero, 62 F. Supp. 3d at 482 (citing United States v. McKneely, 6 F.3d 1447, 1452–53 (10th Cir. 1993)).

### C. Custodial Interrogation

The Fifth Amendment ensures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; United States v. Nielsen, 640 F. App'x 224, 227 (4th Cir. 2016). To protect this right, when a suspect is subjected to a "custodial interrogation," he must be warned that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966).

The test for assessing whether an individual is "in custody" for purposes of Miranda is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (internal quotations omitted). The inquiry is objective and asks whether "a reasonable man in the suspect's position would have understood his situation" as being "in custody." Id. at 421-22. Among the factors to be considered are: (1) the time, place, and purpose of the encounter; (2) the words used by the officer; (3) the officer's tone of voice and general demeanor; (4) the presence of multiple officers; (5) the potential display of a weapon by an officer; (6) and whether there was any physical contact between the officer and the defendant. United States v. Day, 591 F.3d 679, 696 (4th Cir. 2010). It is also

17

relevant if the defendant was isolated and separated from his family.   United States v. Hashime, 734 F.3d 278, 283 (4th Cir. 2013.)

The burden is on the Government to establish that a statement was not the product of custodial interrogation where Miranda warnings are not given. Colorado v. Connelly, 479 U.S. 157, 168 (1986); Matlock, 415 U.S. at 177.

### D. Consent to Search

"Valid consent is a well-recognized exception to the Fourth Amendment prohibition against warrantless searches." United States v. Neely, 564 F.3d 346, 349-50 (4th Cir. 2009) (per curiam); accord Illinois v. Rodriquez, 497 U.S. 177, 181 (1990).  "Consent to search is valid only if it was knowing and voluntary and courts assess validity based on the totality of the circumstances." Trulock v. Freeh, 275 F.3d 391, 401 (4th Cir. 2001) (quotations omitted). That is, the defendant must "freely and intelligently give[] his unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied." United States v. Vickers, 387 F.2d 703, 706 (4th Cir. 1967). Coercion invalidates consent, "no matter how subtly the coercion [is] applied." Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973.

The factors to be reviewed include "the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996). "Whether the accused knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of the consent[.]" Id.

18

The Government has the burden of establishing, by a preponderance of the evidence, that it received valid consent to search. United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007). "[S]howing no more than acquiescence to a claim of lawful authority" does not satisfy the government's burden. Bumper v. North Carolina, 391 U.S. 543, 549 (1968). If it appears that consent was not voluntarily given, then the consent is deemed invalid and the search is determined to be unreasonable. Schneckloth, 412 U.S. at 233.

IV. **Discussion**

Defendant makes the following arguments:

1. That the officers lacked authority to conduct the stop, which was pretextual;

2. That during and after the stop:

   a. The officers conducted an improper nonconsensual weapons pat-frisk and search of Defendant's person;

   b. The officers unlawfully detained and arrested Defendant to investigate unrelated and uncorroborated allegations of methamphetamine distribution at his residence; and

   c. The officers violated Defendant's Fifth Amendment Rights by failing to advise him of his *Miranda* rights after placing him in custody.

3. That the officers did not obtain lawful consent to detain Mr. Villa after the traffic stop, or to search his home.

(Doc. 17); (Doc. 29).

### A.    The Traffic Stop

#### 1.  Reasonable Suspicion

When law enforcement stops a vehicle and detains an occupant, the stop constitutes a "seizure" that implicates the Fourth Amendment.  Brendlin v. California, 551 U.S. 249, 255 (2007).  Accordingly, a traffic stop must be "reasonable under the circumstances." United States v. Palmer, 820 F.3d 640, 648 (4th Cir. 2016).  "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  United States v. Wren, 517 U.S. 806, 810 (1996).  An ulterior motive for the stop is irrelevant.  Id. at 812.

In the instant case, Defendant was suspected of speeding, driving left of center, and driving without a valid driver's license.  (1-26, 58, 66.) Defendant does not dispute that he committed these violations.  See Def.'s Mot. (Doc. 16); Def's Mem. (Doc. 17).  Therefore, the stop of Defendant's vehicle was reasonable.

#### 2.  Outside of Macon County

Defendant argues that Detectives Buchanan and Breedlove did not have the authority to conduct the traffic stop because it occurred outside of Macon County, and Defendant's actions did not constitute "immediate and continuous flight" under N.C. Gen. Stat. § 15A-402.  Def.'s Supp. Mem. (Doc. 29) at 1-2.

Pursuant to N.C. Gen. Stat. § 15A-402, a county law enforcement officer may arrest a person outside of his jurisdiction "when the person arrested has committed a criminal offense within that territory, for which the officer could have arrested the person within that territory, and the arrest is made during such person's immediate and continuous flight

20

from that territory." Id. § 15A-402(d).

The Government does not contend that the stop was made in conformity with N.C. Gen. Stat. § 15A-402 but argues that the officers were authorized to conduct the out-of-county stop by virtue of a Mutual Assistance Agreement that has been entered by the Sheriff's Offices of Macon and Cherokee Counties, and others. See Gov.'s Resp. (Doc. 35) at 1-2. In the alternative, the Government contends that even if the Mutual Assistance Agreement does not apply, suppression of evidence obtained from the stop is not appropriate. Id. at 3-4.

N.C. Gen. Stat. § 160A-288 provides in part as follows:

> (a) Unless specifically prohibited or limited by an ordinance officially adopted by the governing body of the city or county by which the person is employed, appointed, or elected to serve, the head of any law-enforcement agency may temporarily provide assistance to another agency in enforcing the laws of North Carolina if so requested in writing by the head of the requesting agency. The assistance may comprise allowing officers of the agency to work temporarily with officers of the requesting agency (including in an undercover capacity) and lending equipment and supplies.

N.C. Gen. Stat. § 160A-288(a). In short, this statute "allows a police officer to temporarily provide assistance to another law enforcement agency and use his powers of arrest outside of his jurisdiction." Taylor v. Town of Garner, 204 N.C. App. 300, 305, 694 S.E.2d 206, 209–10 (2010).

The applicability of the Mutual Assistance Agreement here, however, is questionable. The Government argues that the Agreement itself constitutes a "standing written request by Cherokee County for the on-the-scene Macon County officers to provide

21

assistance." (Doc. 35) at 2. Yet, the language of the Agreement is ambiguous in this regard. See e.g., Section I. B. ("When temporary assistance is needed . . ., the head of the requesting agency shall notify the head of the assisting agency of the need for such assistance, in writing, whenever feasible. In the event, a request is not feasible to do so, this agreement shall act as the writing to satisfy this requirement.… Where a written request is not feasible as the result of an emergency, a written request will be made as soon as practical as a confirmation of the verbal request.")  Further, it is not clear that the statute contemplates the use of a Mutual Assistance Agreement as a standing or blanket request.  See "Mutual Aid Agreements Between Law Enforcement Agencies in North Carolina" at 5, North Carolina Department of Justice, Law Enforcement Liaison Section, Revised Edition October 2014, posted to NC Emergency Management microsite on the UNC School of Government website, https://www.sog.unc.edu/resources/microsites/nc-emergency-management/sample-documents ("The mutual aid agreement document, by itself, will not suffice for the written request for assistance. There must be a separate written request for assistance."); see also 47 N.C. Op. Att'y Gen. 181 (1978).

No evidence of a separate written request for temporary assistance by Macon or Cherokee County law enforcement has been produced in this case, perhaps because, as the Government puts it, "there is no evidence that anyone, including Defendant, was even aware that the stop occurred in Cherokee County, if indeed it did." (Doc. 35) at 3.

However, even if it is assumed that the Mutual Assistance Agreement did not authorize the officers to act outside of their jurisdiction at the time of the stop, that fact alone may not be dispositive; North Carolina state courts have found that suppression of

evidence obtained from arrests made in violation of N.C. Gen. Stat. § 15A-402 may not be necessary. See State v. Melvin, 53 N.C. App. 421, 428, 281 S.E.2d 97, 102 (1981) ("The evidence obtained in [a] search and seizure need not be excluded even if the arrest out of which the search and seizure arose was unauthorized under G.S. 15A-402."); State v. Harris, 43 N.C. App. 346, 349, 258 S.E.2d 802, 804 (1979).

Defendant appears to concede this point, arguing that the officers' lack of authority to stop Defendant in Cherokee County should be considered as a factor in the overall context of the Motion to Suppress. (Doc. 29) ("[T]he officers' conduct in failing to comply with state law is a relevant consideration under the totality of the circumstances Fourth Amendment analysis.")

The undersigned will not recommend suppression on this basis. Though the evidence indicates that the stop was completed in Cherokee County, the lights and horn of Vehicle 1 were activated in Macon County, the stop site itself was only slightly in Cherokee County, and reasonable suspicion existed to stop Defendant.

**B.     Search of Defendant's Person**

The parties' descriptions of the initial encounter between Defendant and Detectives Buchanan and Breedlove differ as to how many personal searches were performed. Defendant separately challenges a pat-down and a further search of his person. The Report of Investigation likewise reflects this dichotomy and states that Detective Breedlove "conducted a consensual patdown of [Defendant] for weapons followed by a search of his person" (Doc. 17-1) at 3 – 4 (emphasis added).

Detective Breedlove's testimony, however, appears to describe a single search. (1-

30-31.).

The Government argues that this search was consensual, though Defendant denies providing such consent. (Doc. 17) at 17. Thus, the issue here is not whether consent was given voluntarily, but whether it was given at all.

The Government's evidence on this point consists of Detective Breedlove's testimony that Defendant said he "didn't mind [Detectives Buchanan and Breedlove] checking" to confirm his statement that "he had recently hit the marijuana pipe. And that was all he had[.]" (1-66.) The record includes no suggestion that Detectives Buchanan and Breedlove attempted to confirm their understanding that Defendant was communicating his consent to a search of his person, though such confirmation would have been simple to pursue.

Nonetheless, the notion that Defendant consented to a physical search is consistent with the compliant posture assumed by Defendant at that point in the encounter. Defendant had not attempted to flee or resist Detectives Buchanan and Breedlove. To the contrary, he stopped after the blue lights and audible airhorn from Vehicle 1 were activated, readily complied with a request for his license or identification, and freely admitted to consuming marijuana through a vape pen. The lack of additional illegal substances, either on Defendant's person or in his vehicle, is also noted. Further, the Government's evidence includes some testimony about the context and content of this early exchange between Defendant and Detective Buchanan. While that testimony is generalized, it does provide more detail than Defendant's simple statement that consent was not given.

As for the scope of the consent, since Defendant was standing outside of his car at

24

the time, the only way to "check" him for other narcotics would be to search his person which would reasonably have included a search of his pockets. See United States v. Stinson, 468 F. App'x 285, 288 (4th Cir. 2012) (a reasonable person would understand consent to an officer "searching [his] person" to include a search of his pockets) (citing Florida v. Jimeno, 500 U.S. 248, 251 (1991)).

The undersigned, therefore, finds that the Government has proven by a preponderance of the evidence that Defendant consented to a search of his person.

### C.    Custodial Status of Defendant

Defendant next argues that the officers violated his Fifth Amendment right against self-incrimination. Def.'s Mem. (Doc. 17) at 13-15. As it is undisputed that the officers did not advise Defendant of his Miranda rights, the issue is whether such warnings were required, and, more specifically, whether Defendant was in custody during the encounter.

### 1.   During the Traffic Stop

Generally, a person who is detained during a routine traffic stop is not in custody for purposes of Miranda. Consequently, statements that a suspect makes during a stop are admissible even if he does not receive Miranda warnings. Berkemer, 468 U.S. at 440. "Only if the motorist is detained to a degree associated with formal arrest will he be entitled to the *Miranda* protections for in-custody interrogations." United States v. Sullivan, 138 F.3d 126, 130 (4th Cir. 1998) (internal quotation marks omitted).

#### a.  Time, place, and purpose of the encounter

The traffic stop occurred at approximately 7:00 p.m. in early June. It was daylight, and the weather was clear. The beginnings of the stop were routine; Detectives Buchanan

and Breedlove followed Defendant, concluded he had committed traffic-related violations, and signaled for him to pull over. Defendant complied and pulled into a driveway adjoining the public road.

Law enforcement had conducted a lengthy investigation of Defendant that had so far proven to be unfruitful and had saturated the area that evening for the purpose of attempting to observe conduct that could lead to action against Defendant. Detective Breedlove testified, however, that the alleged traffic violations were the sole basis for the stop.

### b. The words used by the officers

Defendant's brief initial interactions with Detectives Buchanan and Breedlove were typical of a traffic stop.

As the stop progressed, and the other officers arrived, Defendant began interacting with Detective Stewart and Lt. Willis. While Defendant's vehicle was being searched, Lt. Willis questioned Defendant regarding the currency that had been taken from him. Defendant's statement that at least one of the officers did not believe his explanation for having the currency is consistent with Lt. Willis's attempt to confirm Defendant's explanation by approaching the house of his purported landlord.

Detective Stewart also spoke with Defendant during this time. This questioning went beyond the scope of the stop, with Detective Stewart asking Defendant if there was anything at Defendant's house that the officers should be worried about, notwithstanding that the house was located approximately a mile away.

### c. The officers' tone of voice and general demeanor

The officers' voices and personal demeanor were relaxed and calm. The officers did not yell at Defendant or act in physically menacing ways. The tenor of the interactions was conversational.

Defendant's allegations regarding his posture during the stop are unclear. He first states that he was required to stand with his legs apart and his hands on the hood of the police car while some officers began searching his car and others questioned him about selling drugs from his home and the currency found on his person. (Aff. ¶ 6). His affidavit subsequently states that after the search of his car was complete, the questioning continued for approximately 25 minutes. (Id. ¶ 8). In the context of other evidence, however, the undersigned finds it more likely that Defendant was required to assume such a position only during the search of his person and was not forced to remain in that position during the rest of the traffic stop.

### d. The presence of multiple officers

Seven officers and four law enforcement vehicles were on the scene, a show of force that exceeds what would be expected for a routine traffic stop.

### e. Display of weapons

The officers were armed, but their weapons were not drawn or referred to at any point.

### f. Any physical contact between the officers and the defendant

No physical contact occurred between the officers and Defendant beyond the personal search at the beginning of the stop.

27

g.  Isolation and separation from family

Defendant was the lone occupant of his vehicle and was not isolated to any greater degree than is typical in a traffic stop.

### 2.  At the House

By the time Defendant and the officers reached the house, it was shortly before 7:30 p.m. The purpose of traveling to the house was, of course, for the officers to search the premises.

The tone and content of interactions between the officers and Defendant at the house were similar in nature to those during the traffic stop.[7]  Likewise, no weapons were drawn and no physical contact occurred.

Defendant was isolated more significantly from others at this point, though the evidence is disputed as to the extent of that separation. The Government contends that Defendant only requested permission to call his wife one time and was prohibited from doing so due to safety concerns since she only spoke Spanish and the officers did not, and further that Detective Stewart only waved to Defendant's neighbors but did not prohibit them from contacting Defendant.

Defendant gives specific testimony that he was not allowed to take multiple calls from his wife or to interact with his neighbors, though no evidence corroborating

---

[7] When asked if, after the officers moved back to the house, the tone of the encounter had changed, Detective Stewart testified, "No. Absolutely not. It would be entirely counterproductive for us to take any kind of accusatory role and be aggressive in any kind of manner at that point. He is allowing us to search his house on the consensual basis. He is doing, at that point, all the right things. There would be no reason for us to mess that up." (1-130.)

Defendant's position has been presented, such as testimony from his neighbors or his wife or information showing that she did attempt to call him during this time.

Defendant could see his personal property, though his use of it was not entirely unrestricted; for example, he would not have been able to use the phone to speak with someone in Spanish.

The question, however, is whether Defendant, at any time during the encounter, was placed in a position equivalent to arrest, and in light of authorities from the Fourth Circuit describing custodial situations, the undersigned does not so find. See, e.g., Hashime, 734 F.3d at 280-81 (noting that officers, equipped with a battering ram, entered the defendant's home with guns drawn, ordered everyone outside, and subsequently questioned the defendant in a basement storage room for three hours); United States v. Colonna, 511 F.3d 431, 433–35 (4th Cir. 2007) (noting that officers awoke the defendant at gunpoint after kicking his bedroom door open, kept the defendant under guard, and kept his family away from him while interrogating him for three hours in a police vehicle); cf. United States v. Hargrove, 625 F.3d 170, 177–82 (4th Cir. 2010) (concluding that a two-hour interview was noncustodial despite an initial pat-down search and an initial security sweep involving a number of officers who had their weapons drawn); United States v. Parker, 262 F.3d 415, 417–19 (4th Cir. 2001) (concluding that a 30-minute interview in a bedroom with the door closed was noncustodial).[8]

---

[8] Though Defendant may have felt scared or anxious, the inquiry is objective and asks whether "a reasonable man in the suspect's position would have understood his situation" as being "in custody." Berkemer, 468 U.S. at 422 (internal quotations omitted).

## D. Extension of the Traffic Stop

Defendant argues that the officers unlawfully extended the traffic stop to investigate unrelated allegations of methamphetamine distribution at Defendant's residence. Def.'s Mem. (Doc. 17) at 9.

"The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015). When a traffic stop is extended beyond the time period that the officer is completing tasks related to the traffic stop, the officer must either obtain consent from the detained individual or identify reasonable suspicion of criminal activity to support the extension. United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017).

In this case, the search of the car lasted approximately 15 minutes, which was normal. While the questioning of Defendant that took place during the stop exceeded the scope of the stop and ranged into inquiries about firearms and narcotics at Defendant's house, those questions did not lengthen the stop itself. Law enforcement is permitted to ask questions unrelated to the purpose of the stop so long as the questioning does not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention. See Arizona v. Johnson, 555 U.S. 323, 333 (2009) ("The seizure remains lawful only so long as [unrelated] inquiries do not measurably extend the duration of the

30

stop.").

The purposes of the traffic stop were completed with the conclusion of the search of the vehicle. At that point, the officers would generally have been required either to take action against Defendant, such as issuing a citation or warning, or allow him to leave. The Government's evidence, though, is that Defendant consented for the officers to search his house *while the search of his vehicle was in progress*. Specifically, Detective Stewart testified that by the end of the search of the vehicle he and Defendant had reached an "arrangement" and that Defendant had invited the officers to go to Defendant's house.

Though Defendant disagrees and contends that he was questioned for another 25 minutes, the record as a whole, including the timing of the consent form by Detective Wright at 7:29 PM, does not support that view. Further, no authorities have been submitted to support the proposition that a traffic stop which began at one location can be extended to a separate location.

Thus, as the traffic stop was completed when the search of the car was finished, the length of time Defendant was detained at the site of the stop was reasonable. Defendant's purported consent to the search of his house is a separate issue and it is addressed below.

###    E.    Consent to Search Defendant's House

At the hearing, the Government argued that the issues of custody and consent to search should be analyzed separately, and the undersigned agrees. Notwithstanding the previous finding that Defendant was not in custody during the traffic stop or the search of his house, his consent to search the house must still be considered.

Warrantless searches of a home are "presumptively unreasonable." <u>Payton v. New</u>

York, 445 U.S. 573, 586 (1980). "[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Id. at 585 (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).

The facts are somewhat in dispute. The Government's evidence indicates Defendant provided consent on three occasions - 1) an invitation given to Detective Stewart while the search of the vehicle was in process, 2) verbal consent in response to Detective Stewart's inquiry at the conclusion of the vehicle search, and 3) on the written consent form.

Defendant states that the idea of searching his house was first brought up by the officers, who claimed to know that drugs were located there and told Defendant that if he would consent for his home to be searched and no drugs were found, he would be released. (Aff. ¶ 9). Defendant states he felt he had no other option, but he does acknowledge providing consent (id. ¶ 10).

Consequently, the issue is one of validity. As noted above, the Government bears the burden of proving that Defendant's consent was given in a knowing, voluntary, and intelligent manner.

### 1. Defendant's Characteristics

No specific evidence has been presented regarding Defendant's level of education or his intelligence, but the record as a whole, including Defendant's affidavit, suggests he is reasonably intelligent. As for maturity, Defendant is married and rents his home, and works as a mechanic by trade. No information has been presented regarding his experience with law enforcement or the criminal justice system.

32

### 2. Conditions and Circumstances

The encounter occurred in public and during evening, but daylight, hours. However, what began as a routine traffic stop in which Defendant was detained by two officers in one vehicle, promptly evolved into a situation involving seven officers in four vehicles, notwithstanding that Defendant complied with all directives, was not armed, and presented no danger or resistance.

Defendant's consents were provided over the course of no more than 30 minutes; the invitation was extended between 7 PM and 7:25 PM, the verbal consent was given at approximately 7:25 PM, and the consent form was signed at 7:29 PM.

Unsolicited consent indicates voluntariness. United States v. Montgomery, 777 F.3d 269, 274–75 (5th Cir. 2015) (quoting LaFave, *Search & Seizure* § 8.2(d)) ("[E]ven less is required to show that the consent is voluntary and untainted" when the consent is unsolicited.). However, the evidence supporting a finding that Defendant asked the officers if they wanted to travel a mile down the road to his house in order to search it is not particularly strong; Detective Stewart did not recall Defendant's exact words and said he "took what [Defendant] was telling [him]" to amount to consent to search. Assuming such an invitation was extended, it came while Defendant stood with Detective Stewart as Detectives Buchanan and Breedlove searched his vehicle, Deputy Younce and Detectives Burrows and Wright stood nearby, and Lt. Willis approached the house of Defendant's purported landlord to test his story about the currency that was located during the stop. This invitation was also provided in response to questions that were outside the scope of the stop itself.

33

The verbal consent was given as the search of the car was concluding. The verbal consent was not an invitation but rather given in response to Detective Stewart's statement to Defendant that "we are going to -- if you're okay with it, we will go down to your house and we'll take a look around."   (1-123.)   Defendant's response, that it was "fine," is acceptable, see e.g., United States v. Johnson, 107 F. App'x 322, 325 (4th Cir.2004) (noting that the defendant had consented to the officer's request to search his vehicle by stating, "fine"), though the exact way the question was phrased is not clear from Detective Stewart's testimony.

The consent form was executed minutes later. Written consent indicates consent was voluntary, though it is not dispositive. See United States v. Boone, 245 F.3d 352, 362 (citing United States v. Navarro, 90 F.3d 1245, 1257 (7th Cir.1996)); United States v. Coleman, 588 F.3d 816, 819 (4th Cir. 2009). The Government's evidence about the discussions with Defendant when the form was signed is not extensive. Detective Breedlove was not close to Defendant and Detective Wright as the form was being reviewed. Detective Stewart was closer but he did not hear the specific discussion between Detective Wright and Defendant. Detective Wright did not testify at the evidentiary hearing. Further, the consent form was executed after Defendant had been taken back to his house in the locked backseat of Deputy Younce's patrol car and while the officers stood in front of his house, presumably waiting to get in.

In addition, all three consents were provided after Defendant's currency, which he advised was his rent money, had been taken from him and secured, though he had not been charged. Likewise, his personal property, including his identification and cell phones,

while near him, were not in his immediate possession.

### 3. Isolation

Defendant was not allowed to call his wife regarding the opening of the safe. He may have also been segregated somewhat from his neighbors. This factor, however, is minimal and the officers' interest in monitoring Defendant and an unknown number of neighbors is understandable.

### 4. Advice regarding Rights

Though Defendant was advised during the traffic stop that he was not under arrest for marijuana possession, he was never told that he was free to go, nor was he told affirmatively that he had the option to decline to allow the officers to search his home. The Government is not required to demonstrate that a defendant knew he had the right to refuse consent, though a defendant's knowledge that he had such a right is a relevant factor in determining voluntariness.  United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996). The parties' evidence is conflicting as to whether the officers attempted to pressure Defendant into providing consent by telling him that they could get a search warrant or the like. As discussed above, Miranda warnings were not given or required.

### 5. Communication Issues

Much has been argued regarding Defendant's ability to understand the officers' statements and to communicate with them. At the time of the encounter, Defendant was 33 years old and had been in the United States for 16 years. Defendant advised the officers that he speaks English "pretty well." Though Defendant's affidavit says he "sometimes" has difficulty fully understanding English, the affidavit does not contain an affirmative

allegation that Defendant did not understand the officers on the day in question. Nor did he ask for an interpreter.

Nonetheless, the potential for communication problems was significant enough that Detective Stewart, in advance, attempted to engage a Spanish-speaking Special Agent to assist with the operation. Concern over language issues did not disappear during the course of the encounter as evidenced by Detective Stewart's call, which apparently was placed *shortly after Defendant was arrested*, to notify law enforcement that an interpreter may be needed for interrogation. Yet, no effort was made during the operation to reach a Spanish-speaking agent by phone to confirm Defendant's willingness to consent to the search of his house.

Thus, under the totality of the circumstances presented here, the undersigned finds that the consent given by Defendant cannot be considered free, intelligent, and unequivocal.

### F. Suppression of Evidence.

The final issue is whether the evidence obtained from the search based upon the invalid consent should be suppressed.

> Suppression is not itself a right explicitly bestowed by the Fourth Amendment. Rather, suppression of evidence obtained through a search that violates the Fourth Amendment is a judicially created prescription for such a violation. See United States v. Leon, 468 U.S. 897, 909, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Indeed, the exclusionary rule is primarily proscriptive: it is designed to safeguard Fourth Amendment rights through its deterrent effect. Id. For that reason, "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be

charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Illinois v. Krull, 480 U.S. 340, 348–49, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (quoting United States v. Peltier, 422 U.S. 531, 542, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) (internal quotation marks omitted)).

United States v. Seerden, 916 F.3d 360, 366 (4th Cir. 2019).

Here, while the officers were no doubt interested in bringing some resolution to their pursuit of Defendant which, so far, had been unfruitful, as Defendant's rights were not sufficiently protected, the items recovered from Defendant's house should be suppressed.

## V. Conclusion

Considering the foregoing, it is **RECOMMENDED**:

1. That Defendant's Motion to Suppress (Doc. 16) be **GRANTED IN PART**, and that the evidence recovered from Defendant's house be **SUPPRESSED**; and,

2. That the Motion to Suppress otherwise be **DENIED**.


Signed: June 10, 2019


W. Carleton Metcalf
United States Magistrate Judge

37

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same.  **Responses to the objections must be filed within fourteen (14) days of service of the objections.**  Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985).